OHIO CLOVER LEAF DAIRY CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 6778, 13029.   Promulgated November 5, 1927.

1. A stipulation by counsel that an item "is an allowable loss for tax purposes in the event the Board decides" a general question, must be disregarded as of no effect because it stipulates a conclusion of law and thus attempts to limit the function of the Board and because it is conditioned upon the decision by the Board of an abstract question not within the issues.

2. Petitioner was in contractual possession of certain depreciable assets and claimed the right to deduct depreciation and losses in respect thereof, setting forth the terms of its contract, *held* upon the evidence that such depreciation and losses have not been established.

*Thomas O. Marlar, Esq., Harry J. Gerrity, Esq.,* and *L. T. Konopak, C. P. A.,* for the petitioner.
*M. E. McDowell, Esq.,* for the respondent.

These proceedings involve deficiencies in income tax of $10,040.82, $34,519.14, and $12,906.10 for 1919, 1920, and 1921, respectively. The controversy arises from the respondent's action in disallowing depreciation on and loss on the sale of property leased under the circum-

stances hereinafter set forth, and in disallowing depreciation on and loss on the sale of certain other property not under lease.

The parties have stipulated all the facts.

### FINDINGS OF FACT.

The petitioner is an Ohio corporation, with its principal place of business in Toledo, engaged in and operating a dairy business. It was incorporated February 14, 1919, with an authorized capital stock of $10,000. The entire issue of stock was subscribed for by the Ohio Dairy Co. and the Clover Leaf Dairy Co., and cash was paid therefor by them in the amounts of $6,500 and $3,500, respectively. The books of the petitioner are and have been during all the times here in question kept upon an accrual basis, and its return of income and profits tax liability for the taxable period ended December 31, 1919, was made upon such basis.

On or about February 15, 1919, the petitioner became the lessee for a period of 20 years of the plant and equipment of both the Ohio Dairy Co. and the Clover Leaf Dairy Co., both corporations located in the city of Toledo, Ohio, and engaged in the business of collection, pasteurization and distribution of milk and dairy products.

The provisions of the lease pertinent to this inquiry are as follows:

THIS INDENTURE made and entered into this 15th day of February, 1919, by and between The Ohio Dairy Company, hereinafter called "Ohio Company," The Clover Leaf Dairy Company, hereinafter called "Clover Leaf Company," (said companies hereinafter called collectively "Old Companies") and The Ohio-Clover Leaf Dairy Company, hereinafter called "Operating Company"; WITNESSES:

\*          \*          \*          \*          \*          \*          \*

1. The Ohio Company and The Clover Leaf Company respectively lease to the Operating Company the property, routes, business, good will and facilities described in the annexed schedule from the 15th day of February, 1919, to the 15th day of February, 1939, upon the rentals, considerations, terms, covenants, options, provisions and conditions herein set forth.

Each of the Old Companies for itself agrees that it will not engage in the business of buying, selling or delivering milk in the City of Toledo, Lucas County, Ohio, during such period of time as this agreement is in full force and effect, or during such period of time as the Operating Company, its successors or assigns, are engaged in the business of buying, selling or delivering milk in the City of Toledo, Ohio, if the Operating Company shall acquire title to the properties hereby leased in accordance with the terms of Paragraph Sixteen (16) herein.

The Operating Company shall not have the right to use the trade name "Daisy Brand" or the name "The Ohio Dairy Company" in the manufacture, sale or delivery of ice cream.

2. The Operating Company shall take over said leased property and continue the business of supplying milk and milk products in and about the City of Toledo, and supply all customers of the Old Companies and others, using for that purpose such of the employees of the Old Companies as are best fitted for

the work, and making such changes in routes and other operating methods as may be best calculated to effect the economies desired.

      *         *         *         *         *         *         *

4. The Operating Company shall use every effort to maintain the property and business turned over and leased to it hereunder so that on the termination of this agreement the business and property of the Old Companies, or its fair equivalent, can be returned to said Old Companies in good operating condition, but on the termination of this agreement the Operating Company shall be under no obligation to return to either of the Old Companies the identical customers, sources of supplies, business or property received from such company, but it shall be at liberty to return the full equivalent of such property, customers, sources of supply and business observing in the division of the property and business upon the termination of this agreement the percentages herein used for the payment of rentals to the Old Companies, and having due regard to future operations and giving such company sufficient property and equipment to carry on its business.

5. All horses, wagons, cans, bottles and other equipment turned over to the Operating Company shall be kept in first class order and condition at all times, and the Operating Company shall at all times have on hand at least as much physical property as was turned over to it, and at least as many customers and routes as were turned over to it, and the Operating Company shall make all repairs and renewals necessary to maintain said property in said condition.

6. The Operating Company shall keep and maintain a depreciation fund sufficient in amount to keep all said property in the state, quantity and condition aforesaid, and to replace the same when worn out or obsolete, and it shall also keep and maintain at all times a contingent fund out of which bad debts, damage claims or other losses can be paid or off-set.

      *         *         *         *         *         *         *

8. The Operating Company shall insure all property usually insured by Dairy Companies against loss or damage by fire or other casualty, free of expense to either of the Old Companies, and in the event of loss or damage the insurance money collected shall be used to repair or replace the property damaged or destroyed.

No damage to or destruction of the property herein described shall operate to terminate this agreement or abate the rentals hereunder or any part thereof.

9. The Operating Company may at any time during the term of this indenture sell, lease, exchange or dispose of any items or part of the property or business hereinafter described no longer used or useful in the conduct of the business. Any such lease of real estate, buildings or equipment shall be subject to termination on reasonable notice so that the Operating Company can restore such property to the owner in case of the termination of this agreement. It shall keep a strict account of the property thus disposed of and of the proceeds or property received in payment or exchange therefor, so that at the end of the term of this indenture the property acquired from each of the Old Companies, or its full equivalent, shall be returned. The entire property or business shall not be sold, exchange [sic] or disposed of, but shall be kept intact as a going concern.

10. The Old Companies and each of them shall on request execute, acknowledge and deliver such instruments or papers as may be required by the Operating Company to completely carry out and perform the terms of this indenture, or to complete any sale, lease, exchange or other disposition of the property made by the Operating Company.

11. The Operating Company shall observe and comply with all the laws and ordinances applicable to the business so that the value of said business shall not be impaired.

12. The business of the Operating Company shall be conducted under a system of accounting to be approved by the Presidents of the Old Companies, so that proper records of the properties and operations shall be kept, and so that there can be a correct ascertainment of the profits or losses.

If during the term of this indenture a controversy shall arise between any of the parties as to any matters of accounting or any entries made or proposed to be made on the books of the Operating Company, and the parties shall be unable to agree, the matter in controversy shall be referred to Robert McIntosh & Company, Ernst & Ernst, or Price, Waterhouse & Company, whichever the President of the Operating Company may select, and the decision of the firm of accountants thus selected shall be final and binding upon all parties.

As rental for the use of the leased property, the Operating Company shall pay to the Ohio Company an amount equal to 55.25% of its net earnings, but in any event not less than $650.00 per month, and it shall pay to the Clover Leaf Company an amount equal to 29.75% of its earnings, but in any event not less than $350.00 per month.

Said rentals in excess of the stipulated monthly rentals shall be paid annually on the 15th day of the second month following the close of the year, except as hereinafter provided.

Said rental shall be treated on the books of the Operating Company as an expense of operation and as if a fixed amount of money had been stipulated as rent. Each month the Operating Company shall set up on its books in a rental account an amount equal to 85% of its net profits for the month, and said amount shall be credited to the Old Companies and the stipulated minimum rental shall be paid monthly subject however, to the proper and necessary adjustment to be made at the end of the year when exact net profits are to be ascertained.

The Operating Company may on request advance to either of the Old Companies an amount not in excess of 50% of the estimated rental accrued in favor of such Old Companies at any time, and such advances shall be charged against such Old Company and shall be deducted at the time of the annual settlement from the rentals payable to it, and if at the end of the year such advances are not repaid out of the rentals, the Old Company receiving such advances, shall reimburse the Operating Company, and the Operating Company shall have a lien upon all the leased property of said Old Company to secure a repayment of such advances, in excess of the stipulated monthly minimum. If any such advances are made both companies shall have the right to demand and receive advances.

The Old Companies shall be under no obligation to refund any part of the fixed monthly rental of $650.00 to the Ohio Company or $350.00 to the Clover Leaf Company, and shall only be obligated to refund advances in excess of such fixed monthly rentals.

13. * * * Each of the Old Companies shall immediately execute, acknowledge and deliver to the Operating Company separate recordable leases of real estate and machinery, providing for the payment of nominal rentals to the Ohio Company and to the Clover Leaf Company and containing terms, provisions and conditions conforming to those herein set forth. This Indenture in any case shall be taken and held to be a part of such leases.

14. Each of the Old Companies shall pay all taxes and assessments charged against it or its property payable on December 20, 1918, and June 20, 1919,

and the Operating Company shall pay all taxes and assessments payable after June 20, 1919, on the leased property.

15. The Old Companies and each of them covenant and agree that they will pay all outstanding obligations, indebtedness or liabilities, which may in any way be or become a charge upon the property described in the annexed schedules, so that the Operating Company shall take said property free of all indebtedness and claims whatsoever excepting the Clover Leaf Company bonds and the Old Companies each for themselves and not for the other warrant the title of the property in the annexed schedules, to be clear and unincumbered, except by taxes and the Clover Leaf Company bonds; that they have good right and title to enter into this Indenture, and that upon the performance of the terms, covenants and conditions, hereof, and the payment of the rentals herein reserved, the Operating Company shall quietly use and enjoy such property during the term of this Indenture.

16. The Operating Company shall have the exclusive option during the term of this Indenture to acquire all of the property, routes, business, good will and facilities, hereby leased, but not any part thereof, for the considerations hereinafter mentioned, by giving to each of the old companies notice thereof by Registered Mail. Payment for said properties, aforesaid, shall be made by delivering to the Old Companies increased capital stock of the Operating Company, to be fully paid up and non-assessable, in such amounts as may be agreed upon by the parties and, should they be unable to agree then the amount of stock to be issued shall be determined by a board of three arbitrators consisting of the persons who shall then be the president of the Ohio Company and the Clover Leaf Company and the president or vice president of a bank or trust company in Toledo to be selected by the president of the Operating Company. The decision of a majority of such arbitrators shall be final and binding. When the amount of stock so determined has been provided by an appropriate increase of the stock of the Operating Company said amount of stock shall be issued and divided by delivering sixty five per cent. (65%) thereof to the Ohio Company and thirty five per cent. (35%) thereof to the Clover Leaf Company or their respective nominees.

Upon the exercise by the Operating Company of the option to purchase the properties, aforesaid, the Operating Company shall be relieved of any further payment of rentals and the Old Companies shall concurrently, upon delivery of such of the capital stock as above provided for, deliver to the Operating Company pursuant to the foregoing provisions good and sufficient conveyances with usual covenants of warranty as to title, the same to be free and clear from all incumbrances [with certain exceptions not material here].

17. In case the Operating Company shall not exercise its option to purchase on or before February 1, 1928, it shall immediately prepare for the return of the property at the end of the term of this Indenture by dividing the property, routes, business, supplies, customers and facilities in its hands in such manner and in such proportion as to enable it to return to each of the Old Companies the property delivered by it to the Operating Company, or the fair equivalent of such property in value and operating utility so that at the end of the term of this Indenture each of the Old Companies can take their property or its equivalent and proceed with its business without undue delay or expense.

On the termination of this Indenture the Operating Company shall restore or put the plants of the Old Companies so that each will be in at least as good condition as it is now in and so that each will be equipped to handle and care for the owners percentage of the business at and after the time of termination.

\*          \*          \*          \*          \*          \*          \*

18. If the Operating Company shall fail to pay the rentals herein stipulated, or to perform the terms, covenants and provisions of this Indenture for a continuous period of three (3) months then either Old Company may give notice of such default to both the Operating Company and the other Old Company, which notice shall specify in detail the default complained of, and if said default specified in said notice shall continue for a period of three (3) months after the date of service of said notice then and in such case said Old Company, giving notice, may at the end of said second period of three (3) months declare this Indenture terminated, and thereupon the properties of each of the Old Companies shall be returned as is provided for in case of a failure to exercise the option to purchase the property, in detail set forth in paragraph 17 hereof. Said notices aforesaid shall be in writing and shall be addressed to the respective parties at Toledo, Ohio, and shall be mailed to the respective parties by United States Registered Mail.

The property and assets covered by the lease of February 15, 1919, were valued and agreed upon by the lessor corporations and the petitioner as lessee for the purpose of ascertaining the rental to be paid under said lease and the interest of the respective lessors and the amount representing such values was set up on the books of the petitioner as follows:

| | |
|---|---:|
| Land | $10,100.00 |
| Buildings | 29,376.30 |
| Plant equipment | 120,655.97 |
| Horses | 17,375.00 |
| Wagons | 21,870.00 |
| Auto truck | 2,000.00 |
| Stable supplies | 568.90 |
| Containers | 12,753.00 |
| Ice cream cans | 1,463.50 |
| Bottles | 4,187.50 |
| Receiving stations | 20,550.14 |
| Office furniture and fixtures | 2,058.25 |
| | 242,858.56 |

In returning its income for the taxable period ended December 31, 1919, the petitioner deducted from gross income, the deduction having been allowed by the Commissioner, the sum of $33,760.66 for repairs.

In returning its income for the taxable period ended December 31, 1919, the petitioner deducted from gross income the sum of $26,-449.99, claimed as depreciation sustained on the property and assets covered by the lease agreement referred to in the foregoing paragraph and credited said amount on its books to a reserve for depreciation. Thereafter, on July 7, 1925, the Commissioner of Internal Revenue mailed the petitioner a deficiency letter in which he disallowed said deduction from income and found a deficiency in tax of $10,042.82.

In returning its net income for the taxable period ended December 31, 1920, the petitioner deducted from gross income the sum of $26,675.04, as depreciation sustained on the property and assets covered by the lease agreement dated February 15, 1919, and credited said amount on its books to a reserve for depreciation. Likewise, in its return for the taxable period ended December 31, 1921, petitioner deducted from gross income the sum of $10,283.67, as depreciation sustained on the property and assets covered by the lease agreement dated February 15, 1919, and credited said amount on its books to a reserve for depreciation. Thereafter, on February 5, 1926, the Commissioner of Internal Revenue mailed the petitioner a deficiency letter in which he disallowed said deductions from income on account of depreciation sustained on said property and assets.

During 1920 the petitioner scrapped, abandoned, and sold, pursuant to paragraph 9 of the lease agreement dated February 15, 1919, certain of the leased assets having a depreciated cost or value of $125,058.79, and received therefor a total consideration of $74,762.67.

Likewise, during the year 1921 a loss was sustained in the amount of $3,699.61 on account of the death and/or sale of horses leased.

In 1920 petitioner sustained a loss of $1,925.09 on the sale of property owned by it, not covered by the lease agreement. In 1921 property owned by petitioner, not covered by the lease agreement, sustained depreciation in the amount of $17,526.

### OPINION.

STERNHAGEN: The foregoing facts were embodied in a written stipulation upon which the case was submitted. From these facts the petitioner argues that as a matter of law it is entitled to deductions for the exhaustion, wear and tear of the leased property, and deductions for certain losses in connection therewith.

The issue of depreciation is so inadequately covered by the facts that we can not reach the question of law. It appears only that the petitioner, acting under article 6 of the contract, set up on its accounts certain amounts as depreciation; and that it deducted these amounts on its returns. The Commissioner disallowed the deductions without saying why, and the petitioner instituted this proceeding.

Assuming without deciding that petitioner is entitled to any deduction for depreciation, such deduction is not proved in fact by a stipulation that an amount was set aside on the books and deducted; for whether this is correct is the very matter in issue. None of the factors for a determination of a reasonable allowance, if any, has been alleged, stipulated or proved, and hence the petitioner must fail. The respondent is sustained.

The petitioner claims deductions for losses by reason of the death of horses and the disposition of property possession of which was acquired under the contract. It is attempted to be stipulated that this is "an allowable loss for tax purposes in the event the Board decides that petitioner is entitled to deduction for loss with respect to the sale of the assets covered by the lease agreement of February 15, 1919." That portion of the agreement between counsel which we have quoted must be disregarded as of no effect for two reasons. In the first place, insofar as it attempts to stipulate that an item is deductible under the statute as a loss, it is a conclusion of law. As such it is either an agreement which entirely removes the question from the proceeding, or else it is an attempt to limit the function of the Board to decide the issue of liability. In either aspect it is ineffective. In the second place, it is conditioned upon the decision by the Board of an abstract question which is not within the issues, i. e., whether the petitioner is entitled as a general proposition to deductions for such loss as may occur on the sale of any of the leased assets.

But insofar as the stipulation agrees upon facts it has been embodied in the findings, and we examine these to consider whether they prove that petitioner has sustained losses deductible under the statute.

The disposition in 1920 for $74,762.67 of the leased assets listed at $125,058.79 may or may not involve a loss to petitioner. At the beginning of the year it had, not the ownership but the possession of the property. This property represented no investment to it, but only a contract obligation to keep and restore a like quantity. *Non constat*, it could have replaced the property for the $74,762.67 and thus been no worse off either in 1920 or at any time thereafter. Similarly as to the alleged loss "likewise sustained" on the death or sale of horses in 1921. If the market price of horses went down it might have made replacements for $3,699.61 less than depreciated cost of the owner. Until petitioner spent money out of its own pocket its capital was not affected.

The respondent is sustained in his disallowance of the alleged depreciation and losses on leased property because of insufficient evidence. The stipulation that losses and depreciation were sustained on property not covered by the lease makes it unnecessary to consider those items.

Reviewed by the Board.

> *Judgment will be entered on 15 days' notice, under Rule 50.*